## JOHNSON v. CADILLAC MOTOR CAR CO.

(Circuit Court, N. D. New York. March 11, 1912.)

**1. NEGLIGENCE (§ 27*)—DANGEROUS INSTRUMENTALITIES—DEFECTIVE CONSTRUCTION—MANUFACTURER'S LIABILITY.**

To manufacture an automobile or to purchase and assemble into a car from different makers the parts of an automobile and put the same on the market for sale by dealers to third persons for use, any essential part of which is known to be so defective, or in the exercise of ordinary care, ought to be known to be so defective as to make the car dangerous to those using it for the purpose for which it was designed and intended by the maker, is a wrongful act, rendering the manufacturer or assembler liable in damages to a third person who purchases it from a dealer in ignorance of such defect and is injured while properly using it.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 25; Dec. Dig. § 27.*

Liabilities of manufacturer and vendors of injurious substances or defective machinery and appliances for injuries to persons other than immediate vendees, see note to Standard Oil Co. v. Murray, 57 C. C. A. 5.]

**2. NEGLIGENCE (§ 27*)—DANGEROUS INSTRUMENTALITIES—MANUFACTURER'S LIABILITY.**

To render a manufacturer liable to a purchaser of the instrumentality for injuries caused by defect therein, which was known, or could have been known by the exercise of reasonable care by the manufacturer before the instrument was placed on the market for sale, it is not necessary that such instrument or machine properly constructed should have been one of an inherently dangerous nature.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 25; Dec. Dig. § 27.*]

**3. NEGLIGENCE (§ 27*)—DANGEROUS INSTRUMENTALITIES—AUTOMOBILES—MANUFACTURER'S LIABILITY—INSPECTION.**

Plaintiff purchased an automobile, assembled by defendant from parts purchased from other reputable manufacturers, and was injured while using the same by the breaking of a wheel, due to the rotten character of one or more of the spokes therein. The wheels when delivered were covered with a priming coat of paint, so that the nature of the wood could not then be determined without scraping off the paint or drilling into the spokes. There was no proof that such test had ever been made in the wheel or automobile trade, and the jury found that, if made, it would have been the exercise of extraordinary, as distinguished from ordinary, care; that defendant did not know of the defect and could not have discovered the same in the exercise of ordinary care; but also found that defendant did not use due and proper care in purchasing its wheels and finishing and putting the same in its automobiles, and in giving them the tests required. *Held*, that defendant was not required, in the exercise of ordinary care, to scrape the paint off the spokes in order to test the character of the wood, and that the findings were therefore insufficient to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 25; Dec. Dig. § 27.*]

At Law. Action by E. Wells Johnson against the Cadillac Motor Car Company. Judgment for plaintiff. On defendant's motion to set aside the verdict, directed by the court on special findings of the jury, on the ground that, based on the findings, the verdict was contrary thereto and unsupported thereby, and if the findings in favor of

plaintiff would support such verdict, such findings, or the vital one, were contrary to and unsupported by the evidence. Motion granted.

Henry V. Borst, for plaintiff.

Hun & Parker, M. D. Reilly, and William Van Dyke, for defendant.

RAY, District Judge. The plaintiff is a liveryman and purchased an automobile for use in his livery and running about the country of a firm dealing therein, which firm obtained same from the defendant company for sale in the market for use by the purchaser. The defendant company is a manufacturer of automobiles, but not of all the parts thereof, and makes and sells same to others for use or for resale and use by the purchaser. The defendant does not actually make its own wheels used in making its automobiles, but purchases them of a reputable concern engaged in making and selling wheels for automobiles. When shipped and when received by the defendant company they are covered with a coat of paint known as the priming coat. This priming coat is put on to protect the wheels from moisture, and not for concealment of defects or improper material. Not long after purchasing this machine, and while using it in a proper manner on an ordinary good country road and running at ordinary speed, one of the front wheels collapsed by reason of one or more defective spokes therein and used in the original construction thereof, and the car overturned, pinning the plaintiff thereunder, and he received serious and permanent injuries.

The evidence was sufficient to sustain the following:

(1) The automobile broke down solely by reason of these defective or dead wood spokes in the wheel while running at ordinary speed for an automobile and on the highway of suitable construction and character for such use.

(2) By reason of the presence of this (or these if more than one) defective, or dead wood spoke in the wheel the automobile in the hands of the owner and user and when properly used and run at ordinary speed for an automobile, was liable to break down, overturn, and seriously injure, if not kill, the persons riding therein. In short, this automobile, in fact, was a machine or instrumentality imminently dangerous to human life when under ordinary circumstances and conditions put to the use for which intended by the defendant company.

(3) This condition of this wheel, and consequently of this automobile, was the result of the negligence of the maker of the wheel, the Schwarz Company, which made and sold the wheel to the defendant company. The automobile was a heavy machine and made to carry from 4 to 6 persons or even more, and as the front wheels are turned to the right or to the left as the case may be in directing the course of the machine, the wheels are subjected to great sidewise or lateral pressure, and hence the well-known necessity for strong and sound spokes in the wheels. If the wheels are not of this character, and this fact is known, or in the exercise of ordinary care ought to be known, to the maker and seller, he properly may be said to have known the dangerous character of the machine itself.

(4) The defendant company had no actual knowledge of the de-

fective spoke or spokes in this wheel, and was not shown to have had actual knowledge that the Schwarz Company used defective spokes or wood in making its wheels; but there was evidence tending to show that the defendant company might have ascertained this fact by the exercise of extraordinary care and inspection of wood used in the construction of wheels at the Schwarz factory.

(5) The evidence tended to show that the defendant company on receiving its wheels from the Schwarz Company used all known and ordinary tests for ascertaining and determining their sufficiency and strength and tested the machines thoroughly after construction and before putting them on the market for the purpose of discovering defects or weakness, if any.

(6) There was evidence pro and con that the defendant company might have discovered the character of the wood in the spokes of this wheel (or others) by scraping off the priming coat of paint referred to. The defects might have been discovered by taking the wheels to pieces or by sawing into or boring into the spokes; but, as this would have been tantamount to the destruction of the wheel, the jury was instructed that the defendant company was not obligated to make such tests.

(7) The jury was told that, while the defendant company had the right to rely on the good reputation and character of the Schwarz Company as a maker of wheels and on the high character and reputation of the Schwarz wheels, still its duty did not end there, and that it was bound to use all known and ordinary tests for determining the character and strength of the wheels.

The jury found: (1) That the car was being carefully and properly driven by the plaintiff; (2) that the breaking down of the wheel was caused solely by the dead and dozy and consequently weak condition of the wood in the spokes of the wheel; (3) that such wood was not put in the wheel with the knowledge or consent of the defendant company; (4 and 5) that the defendant company did not know the Schwarz Company used such wood in the construction of its wheels generally, or in the construction of those it sold to it (the defendant). The jury also found (6) that the defendant company did not know of the weakness or defect in this wheel, and that such defects could not have been discovered in the exercise of ordinary care by any proved and known test or method of inspection, and that the defendant company did not willfully omit or neglect to exercise ordinary care in inspecting or testing the wheel in question after it came from the Schwarz Company by omitting to use ordinary and usual or known methods of inspecting or testing same. The jury expressly found that the defendant company did not "put the car in question on the market with knowledge that the wheel in question was in a weak or defective condition by reason of unsuitable, weak, or dozy wood in the spokes." To the following questions submitted to the jury it answered, "No," viz.:

"Did the Cadillac Company use or exercise due and proper care, that is, ordinary care, in purchasing its wheels of the Schwartz Company and finishing and putting same on its automobiles and giving them the test it did and then putting them (the automobiles) on the market?"

Under the evidence in the case and the charge of the court, and in view of the other findings, the jury must have found that the defendant company was negligent in failing to ascertain the fact that the Schwarz Company did sometimes use defective spokes by omitting, either (1) to make proper inquiries and examination at the Schwarz factory in Philadelphia, or (2) to scrape off the priming coat before finishing the wheels and putting them on an automobile.

There was uncontradicted evidence that the defendant company did send a man to the plant of the Schwarz Company. There was no evidence he failed to make proper inquiry and examination, or that he discovered any defect in the wheels, wood used, or in methods employed. His report was favorable to the Schwarz wheel.

Assuming that there was negligence—legal negligence—in not scraping off the priming coat of paint from these wheels, and that such scraping would have disclosed the bad wood, will it (such finding) support· this verdict under the decisions and the complaint?

First, the jury expressly found there was no negligence in omitting to use any "ordinary and usual" or known method of testing or inspecting; and, second, it expressly found that the defective condition could not have been discovered "in the exercise of ordinary care by any proved and known test or method of inspection." It follows that the jury found that scraping off the paint from a primed wheel was not a known test or method of inspection and was an extraordinary and unknown method of inspection or testing in the trade. As stated, the jury expressly ·found the defendant company had no actual knowledge of the defective condition, and hence the question resolves itself into this: Can the defendant company be held liable because it failed to use an "unproved" or an "unknown test or method of inspection" which if used would have disclosed the defective condition?

[1] To manufacture an automobile or to purchase and assemble into a car from different makers the parts of a car or automobile and put same on the market for sale by dealers to third persons for use, any essential part of which is known to be defective or in the exercise of ordinary care ought to be known to be defective and so defective as to make the car dangerous to those using it for the purpose for which designed and intended by the maker, is a wrongful act, and the person or corporation so manufacturing or assembling the car or automobile and placing it on the market is liable in damages to the third person who purchases it from the dealer in ignorance of such defect and is injured while properly using same. The common sense of this proposition is evident, and the legal liability in such cases has been declared in numerous decisions. While there is no contractual relation between the maker and such third person, the law imposes a duty and attaches the legal liability. If the complaint charges such an act, it charges an illegal or wrongful act, and it neither adds to nor detracts from the sufficiency of the complaint to clothe the language used in describing it with superfluous phrases or adjectives. The ferocity of the language adds nothing and detracts nothing, provided the wrongful act be actually alleged. So if the ferocious aspects of the case alleged are not proved, the case is made out if the proof sustains the proposition that defendant made and put on ·the market for

sale to users a machine or instrument which, because of negligent construction or defective material used in the construction thereof, was in fact and to its knowledge dangerous to the life or limb of the user when put to the use for which intended and sold.

[2] It is, of course, true that such defect must have been unknown to the purchaser and user injured, the proximate cause of the injury, and that the injury must have been sustained by reason of such defect. To create liability in such a case, it is not necessary that the instrument or machine should have been one of an inherently dangerous nature. If perfectly safe to users as ordinarily made and used, still, if so defectively constructed by reason of poor workmanship or the use of poor material that it was dangerous to the life or limb of the user when he put it to the uses for which intended by the maker, the maker is liable, for he knew, or in the exercise of ordinary care ought to have known, of the defects. A gun is not an article inherently dangerous to human life. If let alone it is perfectly harmless and can do no injury to any one. It is only when used that it becomes a dangerous instrumentality. It is intended to be loaded with powder and ball or some other explosive material and used either for the destruction of life or in some innocent amusement. The manufacturer of guns knows this, and should he make and put upon the market for sale to others for use by them a gun with a barrel made of ordinary tin metal or lead so colored as not to be distinguished from gun metal, he would be liable to a third person who should purchase such gun and in using same be seriously injured. The gun so made would not be inherently dangerous to human life if hung upon the wall and unused, but it would be inherently and imminently dangerous to human life the moment it was put to use for the purposes intended by the maker thereof and the purchaser thereof. The liability in such cases is not confined to the negligent construction and putting upon the market of articles of an inherently dangerous nature, but extends to and includes all articles intended for use by others which are so defectively constructed that by reason of such defective construction they are articles of an inherently dangerous nature when put to the use for which intended. Gunpowder, dynamite, preparations of arsenic, and other poisons, and many other things, are articles of an inherently dangerous nature whether put to the use for which intended or not. A steam engine without water and fire is no more dangerous than an ordinary wagon, but it becomes an article of an inherently dangerous nature the moment water and fire are placed therein and steam is generated. An automobile is not an article or a machine of an inherently dangerous nature. Alone and of itself it will not move, explode, or do injury to any one. Put gasoline in the tank and set it in motion upon the highway, and it becomes at once an article of an inherently dangerous nature if defectively constructed. Such defect may reside in the steering apparatus, so that the driver is powerless to control it, or, as in this case, in the defective spokes of the wheel which made it liable to break down, overturn, and destroy the lives of those using it the moment it was put to the use for which intended. Injury to the user of an automobile from the breaking of a wheel is incident to its use, but not necessarily incident to its use if properly constructed of

suitable material. Injury to the user of an automobile and to all riding therein naturally follows from a defective construction thereof, although such injury does not always follow its use. ·

[3] The jury in this case in effect found that the automobile manufactured by the defendant company and purchased by the plaintiff from a dealer was inherently dangerous to human life when, and only when, put to the use for which intended either by the maker and seller or the plaintiff, the purchaser. The jury by its findings also expressly negatived knowledge of the defective construction or defective material used in the construction of the car by the defendant company. The jury found that the defendant company did not know that the Schwarz Wheel Company used weak, dead, or dozy wood in the construction of its wheel generally, or those sold and delivered to the Cadillac Company. The jury also found that there was no failure to discover the defect in this wheel by failure to employ any proved and known test or method of inspection; that is, the jury found that the defective condition of the wheel could not have been discovered in the exercise of ordinary care by any proved and known test or method of inspection, and that the defendant company did not willfully omit or neglect to exercise ordinary care in inspecting or testing the wheel after it came to the defendant company by omitting to use ordinary and usual or known methods of inspecting or testing the same. The jury also found that the defendant company did not put the car or automobile on the market with knowledge that the wheel in question was in a weak or defective condition by reason of unsuitable, weak, or dozy wood in the spokes.

As before stated, the jury found, or must have found to support its tenth finding, that the Cadillac Company might have known of the defective spokes by resorting to the unknown and unproved test of scraping the priming coat of paint therefrom. This, of course, would have involved the scraping of the paint, more or less of it, from every spoke of each and every wheel purchased by the defendant company from the Schwarz Company. The question is: Can knowledge of the defective conditions be attributed or charged to the defendant company by reason of its failure to employ this unproved and unknown test? It may be argued that this test is so simple that it would have necessarily occurred to any one manufacturing or assembling automobiles to make it. But the jury has found in effect that such a test would have been unusual and an unproved and an unknown test in the business. The defendant may properly be charged with knowledge of those facts which it ought to have known in the exercise of due care and diligence.

In Statler v. Ray Mfg. Co., 195 N. Y. 478, 481, 88 N. E. 1063, 1064, the Court of Appeals, per Hiscock, J., said:

"We think further that there was evidence which permitted a jury to say that the defendant, knowing the uses for which the urn was intended when it marketed the same, was guilty, and of course chargeable with knowledge of defective and unsafe construction."

This is equivalent to a declaration that a corporation is necessarily chargeable with legal knowledge of defective and unsafe construction

resulting from negligence on its part. That is, if the manufacturer is negligent, it must know that it is negligent; and, if it is guilty of defective or unsafe construction, it must have knowledge thereof. In the case at bar it is contended that the defendant company might have known, and therefore in the legal sense did know, that the wheel in question contained defective spokes. To charge the defendant company with actual knowledge, it must appear that it did something affirmatively which it had no right to do, or neglected to do something which it ought to have done. The defendant company was guilty of no affirmative act amounting to negligence. Did it fail to do anything which amounted to negligence in the legal sense? As twice stated, its only failure was to resort to the unknown, unproved, and untried expedient of scraping the paint from the spokes of the wheels after being delivered by the Schwarz Wheel Company to the defendant company.

The court told the jury, and there was no exception to the charge:

"If this defendant company purchased from a manufacturer of recognized standing and reputation these wheels, then this defendant company was justified in assuming that in the manufacture proper care was taken and that proper tests were made of the different parts, and that proper material was used in the manufacture of those wheels, and that, as delivered to it, the defendant company, here by the Schwarz Manufacturing Company, they were in a fair and a reasonably safe condition for use. That would be the law, that is, the law of this case, unless it had actual knowledge to the contrary.

"But, of course, that did not end the duty of the defendant company, the fact that it had the right to assume that the wheels were in a fair and a reasonably safe condition for use. Now, it had a further duty. It was the duty of the defendant company to subject the wheel, the wheels, to ordinary tests for determining their strength and efficiency, the ordinary test, and that test includes examination, ordinary test and examination to determine the efficiency and strength of those wheels. Now, were there any ordinary tests? Is there any proof here of ordinary tests? If so, what? It is for you to say, and if any are established, did the defendant use them? * * * I say to you that defendant was under no obligation to cut into and bore into or to take to pieces those wheels, but they were under obligation to apply such well-known common sense tests, established tests, as were known to the trade or dictated by plain common sense; that was their obligation, and that was the full extent, full measure, of their obligation in that regard.

"So now, gentlemen, you are to say, it is for you to say, under all the evidence in this case, has the plaintiff proved to your satisfaction by a fair preponderance of the evidence, if you come to the question and are satisfied and believe and find that the wheel went to pieces, broke down because of defective wood, improper wood in the front wheel, if you come to that and find that, then can you say, under your oaths, on the evidence in this case, that this defendant company, through its managers, those who were running the business, were willfully and knowingly negligent in failing to apply proper tests and examinations of those wheels after they came to them to determine their strength. * * *

"Now, you have heard the evidence on both sides, what defendant did do and what it didn't do so far as it didn't do what plaintiff claims defendant should have done, and it is for you to say, gentlemen, on your oaths, on the evidence in this case, did defendant willfully neglect to do what it ought to have done: that is, to apply tests and examinations which experience and knowledge in the automobile trade taught it ought to apply, to determine the character of the wood in those wheels, and therefore the strength of them and the efficiency of them for the purpose for which intended?"

As already stated, the plaintiff gave evidence tending to show that the dozy and dead wood might have been discovered by scraping the

paint from the wheel. The defendant gave strong evidence to the contrary. The defendant company did not claim that it made this test. There was no evidence that such a test is used or ever was used in the trade. It would be a most extraordinary test to make. It would require the scraping of the paint from thousands of wheels annually and from tens of thousands of spokes. Can this verdict be sustained, in view of the charge and of the tenth finding, which, with the answer of the jury thereto, reads as follows:

"Did the Cadillac Company use or exercise due and proper care, that is, ordinary care, in purchasing its wheels of the Schwarz Company and finishing and putting same on its automobiles and giving them the test it did and then putting them on the market? Answer: No."

Some of the broken spokes of the wheel in question or parts of them were produced in court and put in evidence. These were shown to a representative of the Schwarz Wheel Company, and he admitted that one of the spokes was not suitable for the wheel of an automobile if all the spokes in the wheel were of that character. He contended, however, that one spoke of that character in each wheel would not weaken it. He also testified that spokes of that character of wood sometimes went into the wheels, or, at least, his evidence was such that the jury would have been justified in finding that occasionally spokes of that character went into the wheels manufactured and sent out by the Schwarz Company. The jury was therefore justified in finding that the wheel in question contained at least one and perhaps more of what we may call dead wood spokes, that is, weak, insufficient spokes, and that it went to pieces because of such defective spokes, and that the defendant company might have discovered the defects in this wheel, that is, the defective spokes, by scraping off the paint, or priming coat, thereon. We are returned to the inquiry: Was the defendant company chargeable with negligence in that it did not apply this test? Was the jury justified in saying that it was such a commonplace, well-known test that it would have occurred to any person in the wheel business to make it? There was no proof in the case that this test ever had been made in the wheel trade or in the automobile trade.

It can be contended that the defendant company should have sent or provided a man at the Schwarz Company's plant to inspect the wheels before the priming coat was applied and the wheels shipped. This could have been done, but it would have been an extraordinary precaution.

In Richmond & Danville R. v. Elliott, 149 U. S. 266, 271, 272, 13 Sup. Ct. 837, 840 (37 L. Ed. 728), the court said:

"With regard to the defect in the iron casting, which seems to have been revealed by the explosion, it may be said that it is not necessarily the duty of a purchaser of machinery, whether simple or complicated, to tear it to pieces to see if there be not some latent defect. If he purchases from a manufacturer of recognized standing, he is justified in assuming that in the manufacture proper care was taken, and that proper tests were made of the different parts of the machinery, and that as delivered to him it is in a fair and reasonable condition for use. We do not mean to say that it is never the duty of a purchaser to make tests or examinations of his own, or that he can always and wholly rely upon the assumption that the manufacturer has fully and suffi-

ciently tested. It may be, and doubtless often is, his duty when placing the machine in actual use to subject it to ordinary tests for determining its strength and efficiency. Applying these rules, if the railroad company, after purchasing this engine, made such reasonable examination as was possible without tearing the machinery to pieces, and subjected it fully to all the ordinary tests which are applied for determining the efficiency and strength of completed engines, and such examination and tests had disclosed no defect, it cannot, in an action by one who is a stranger to the company, be adjudged guilty of negligence because there was a latent defect, one which subsequently caused the destruction of the engine and injury to such party."

In Westinghouse E. & Mfg. Co. v. Heimlich, 127 Fed. 92, 62 C. C. A. 92, the court, per Lurton, C. J., held:

"Where defendant purchased a derrick chain from reputable chainmakers, who represented that it was of the highest quality of iron, handmade and tested, and it appeared that the chain was externally sound, and had been subjected to a careful visual inspection from time to time, during its three months' use, without disclosing any defects, before it broke because of crystallization of the iron, causing the death of plaintiff's intestate, defendant was not guilty of negligence in failing to test the chain by subjecting it to a strain for the purpose of discovering latent defects therein."

See, also, the cases cited by Lurton, C. J., in his opinion in the case cited.

There was no evidence that the assembled automobile was not subjected to proper and suitable tests as to strength and efficiency after being assembled and painted and before being put on the market, and the defendant gave evidence which was not contradicted that such tests were made. On the evidence and special findings of the jury, in view of the decisions of the courts, I am of the opinion the verdict cannot be sustained, and that it should be set aside and a new trial ordered.